Amparo CARDENAS, Appellant

v.

William French SMITH, Attorney General of the United States.

No. 82–2504.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 19, 1983.

Decided April 17, 1984.

William A. Cerillo, Washington, D.C., with whom Charles Emmet Lucey, Washington, D.C., was on the brief, for appellant. Charles R. Work, Washington, D.C., also entered an appearance for appellant.

Rebecca L. Ross, Asst. U.S. Atty., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, Royce C. Lamberth, R. Craig Lawrence, Asst. U.S. Attys., and Mary Jo Grotenrath, Atty. Dept. of Justice, Washington, D.C., were on the brief, for appellee.

Before MIKVA and GINSBURG, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

The primary issue we address in this appeal is the ability of a nonresident alien to seek redress in American courts for

wrongs allegedly committed by the Attorney General of the United States. Prior to discovery, the district court granted summary judgment for the government and dismissed the complaint. *Cardenas v. Smith*, 555 F.Supp. 539 (D.D.C.1982). Because greater development of the facts is necessary to evaluate certain of appellant's claims, we conclude that the district court's dismissal was premature. Accordingly, we reverse the district court's decision in part and remand for further proceedings.

## I. BACKGROUND

In 1973, the United States of America signed the *Treaty Between the United States of America and the Swiss Confederation on Mutual Assistance in Criminal Matters* (the Treaty). The Treaty creates a structure under which the American and Swiss governments can obtain information and evidence needed for criminal investigations and prosecutions. Treaty Article I. In general:

> The Treaty provides for broad assistance between the United States and Switzerland in locating witnesses, production, and authentication of judicial and business records, and service of judicial or administrative documents. Special assistance is required where organized crime is involved. The Treaty is invoked by a United States request for assistance addressed to Switzerland or a Swiss request for assistance addressed to the United States.

*Technical Analysis of the Treaty Between the United States and Switzerland on Mutual Assistance in Criminal Matters* (reprinted in *Message from the President transmitting the Treaty with the Swiss Confederation on Mutual Assistance in Criminal Matters*, 94th Cong., 2d Sess. 34 (1976)) (Technical Analysis, all page notations refer to the President's Message). The country from which information or action is requested has the discretion to refuse assistance. Treaty Article 31. *See also* Treaty Article 8.

The present litigation traces to April 1982 when, pursuant to the Treaty, appropriate authorities within the Justice Department requested assistance from their Swiss counterparts. Shortly after this communication, the Swiss seized at least one bank account in Switzerland in which Amparo Cardenas, the appellant, had an interest. At that time, Amparo Cardenas, a citizen and resident of Colombia, was neither the subject of investigation nor under indictment. Charges, however, were pending against her brother for alleged violations of American narcotics laws. Allegedly, these charges were the catalyst for the American decision to contact the Swiss. We do not know, however, the substance of the communications between the two governments. Appellant Cardenas alleges that the Justice Department directed, ordered, requested, or advised the Swiss to confiscate her assets. The government, in an affidavit filed with its motion for summary judgment, avers that the Department of Justice merely requested "assistance in obtaining certain information relative to one or more bank accounts in the name of [Cardenas' brother]." The government admits that, in addition to seeking information, its request

> contained the additional *suggestion* that any assets located as a result of our request be frozen under Swiss law until such time as a Swiss court could determine whether, in accordance with Swiss law, the assets should be forfeited to the Swiss canton in which they were located. (emphasis added).

Affidavit of Michael E. Abbell. Finally, the government contends that it learned of Amparo Cardenas' existence only when it reviewed the documents furnished by the Swiss and discovered her name on one of the accounts. *Id.*

When notified that the Swiss had confiscated the account, Cardenas filed the instant action, alleging that the Attorney General violated the Fifth Amendment, the Fourth Amendment, the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A) (1982), and the requirements imposed by the Treaty. In each count, Cardenas seeks declaratory and injunctive relief, requests

the district court to declare defendant's actions unlawful, and seeks an order directing the "defendant to take all necessary action to revoke his order to the Swiss authorities and to restore to plaintiff her property." Cardenas also seeks compensatory damages for the alleged Fourth Amendment violation. Moreover, we are informed that Cardenas has filed suit in Switzerland challenging the Swiss action and seeking to prevent the forfeiture of her funds to the Swiss government.

The district court, prior to discovery, granted summary judgment for the government and dismissed the complaint. Explaining that it had "no basis for attempting to apply constitutional standards on behalf of a nonresident alien with respect to a res which is not subject to the court's control," the district court dismissed the constitutional claims. In reaching this conclusion, the district court discounted the significance of the dispute over the content of the Justice Department's communication with the Swiss: "Whether defendant inquired of the Swiss about plaintiff directly or about [her brother] is irrelevant to this case." As to the counts under the APA, and apparently as to the count directly under the Treaty, the court concluded that the Treaty precluded judicial review by American courts.

## II. DISCUSSION

In reviewing the district court's decision to dismiss Cardenas' complaint, we need address three issues, all of which go to Cardenas' ability to maintain the present action. The first is whether Cardenas, as a nonresident alien, has standing to assert her constitutional claims. Second is whether Cardenas has a cause of action directly under the Treaty. And third is whether the Treaty precludes judicial review of Cardenas' statutory and constitutional claims.

### A. *Standing of a nonresident alien to assert constitutional claims.*

The district court dismissed Cardenas' constitutional claims, reasoning:

This court has no basis for attempting to apply constitutional standards on behalf of a nonresident alien with respect to a res which is not subject to the court's control .... The res at issue here is the Swiss account in Switzerland. The court can take no action that would affect the status of the frozen accounts belonging to the plaintiff and damages are precluded absent compliance with the Federal Tort Claims Act.

*Cardenas v. Smith*, 555 F.Supp. at 540. At first blush, the district court's analysis could be interpreted as an application of the "local action" doctrine. Under that judge-made doctrine, " 'local actions' must be brought in the district where the res that is the subject matter of the action is located." *See* C. WRIGHT, FEDERAL COURTS § 42, at 249 (4th ed. 1983). Wright notes that although the local action doctrine is usually discussed as a matter of venue, some courts have treated this concept as running to the court's jurisdiction. In any event, had the district court intended the local action concept to apply, it first would have had to consider whether the action here was local or transitory. Because it did not so consider, we must conclude that this doctrine was not the basis for its decision.

Instead, we read the court's opinion as holding that the plaintiff lacked standing to raise the tendered constitutional claims. This interpretation of the district court's holding is buttressed by the fact that the court observed that it could not redress the alleged injury, an observation that suggests that standing was the focal point of its analysis. Moreover, the district court dismissed the complaint, the proper result if a plaintiff lacks standing.

■ Before a federal court is empowered to conclude that a party has standing, that party must satisfy the constitutional requirements that devolve from the Article III rule that federal courts decide only "cases or controversies." The essential requirements of constitutional standing are " 'some actual or threatened injury [suffered] as a result of the putatively illegal

conduct of the defendant,' and an injury that 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted) (quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1979)). The injury in fact requirement assures that the plaintiff has a personal stake in the outcome of the controversy. *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

Ms. Cardenas clearly suffered an injury in fact. Having received no notice, she found herself without access to her property, namely, that money which she allegedly had deposited in her Swiss bank account. It is beyond cavil that the deprivation of one's property is a sufficient injury to satisfy the injury in fact requirement.

■ That Cardenas is a foreign nonresident alien does not alter the fact that she has suffered a concrete injury in fact sufficient to ground Article III standing. For purposes of Article III standing, Cardenas' status as a nonresident alien does not obviate the existence of her injury; it is the injury and not the party that determines Article III standing. *See generally Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Whether Cardenas is Colombian or American, she still has a personal stake that would be affected by a resolution of the controversy. The recent Supreme Court decision in *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983), supports this conclusion. In *Verlinden,* a case under the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. § 1330(a), a Dutch Corporation sued the Central Bank of Nigeria in federal court and alleged that the latter had breached a letter of credit. One issue was the constitutionality of the FSIA's grant of jurisdiction to federal courts to resolve disputes between foreign plaintiffs and foreign states. The Court found FSIA to be constitutional. Implicit in that conclusion is the proposition that Article III permits foreign plaintiffs who have suffered a concrete injury to sue in United States courts under at least some circumstances. Earlier cases of this circuit have similarly held. *See, e.g., Constructores Civiles de Centroamerica, S.A. v. Hannah,* 459 F.2d 1183 (D.C.Cir.1972); *Kukatush Mining Corp. v. SEC,* 309 F.2d 647 (D.C.Cir.1962).

■ Likewise, the location of the injury does not affect Cardenas' satisfaction of the Article III standing requirement. As an initial matter, we note that because the district court prematurely truncated discovery, we are unable to ascertain whether the offending injury occurred abroad or on American soil. For example, although the seized accounts were located in Switzerland, if Cardenas could demonstrate that she was the victim of a conspiracy within the Justice Department, at least part of the injury arguably would have occurred in this country. Assuming, however, that the injury occurred abroad, Cardenas could still satisfy the Article III standing requirements. An injury endured abroad is not less of an injury for Article III standing purposes because it happened on foreign soil. *See, e.g., Toscanino v. United States,* 500 F.2d 267, *reh. denied,* 504 F.2d 1380 (2d Cir.1974). *See generally Reid v. Covert,* 354 U.S. 1, 6, 77 S.Ct. 1222, 1225, 1 L.Ed.2d 1148 (1956) (plurality) (opinion of Black, J.) (government actions against citizens abroad); *Powell v. Zuckert,* 366 F.2d 634 (D.C.Cir.1966) (same).

■ We therefore conclude that Cardenas has satisfied the Article III injury in fact requirement. That conclusion, however, does not end our Article III standing analysis. The injury suffered must be one that can fairly be traced to the government's action and one that is "likely to be redressed by a favorable decision." *Valley Forge Christian College,* 454 U.S. at 472, 102 S.Ct. at 758. *See Common Cause v. Department of Energy,* 702 F.2d 245, 250

(D.C.Cir.1983). In the present litigation, only the redressible injury component is in controversy. This component, however, is fatal to that part of Cardenas' complaint that seeks injunctive and declaratory relief.

■ There is little likelihood that the injunctive and declaratory relief Cardenas seeks would redress her injury since such relief is unlikely to result in the release of her accounts or otherwise compensate her for injuries endured. The Treaty provides no mechanism by which the United States Attorney General can order the Swiss to release the accounts or to reverse actions already taken. Indeed, the Treaty's entire scheme is directed at requests for, and the sharing of, information, documents, and witnesses. We certainly are without power to enforce an order issued directly against the Swiss government. Moreover, we are highly doubtful that a request to release the account, issued by the Attorney General pursuant to an order by an American court, would have any impact on litigation currently pending in the Swiss courts. In that vein, we note that the Swiss government has much at stake in that litigation, for if Cardenas is unsuccessful the money escheats to the Swiss.

A case which presented issues similar to the present case is *Greater Tampa Chamber of Commerce v. Goldschmidt*, 627 F.2d 258 (D.C.Cir.1980), where a plaintiff challenged an Executive Agreement on air travel between the United States and the United Kingdom. This court found that the plaintiff lacked standing because there was not "a substantial likelihood that the court could redress the injury." The relief the plaintiff there requested could be obtained only by the consent of the British government. *Id.* at 261; *see also Winpisinger v. Watson,* 628 F.2d 133, 139 n. 29 (D.C.Cir.), *cert. denied,* 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980). Similarly, the relief in the present case could be obtained only through the consent of the Swiss government. Accordingly, Cardenas lacks standing as to her claims for injunctive and declaratory relief.

■ Cardenas, however, also seeks compensatory damages from the American officials involved. A damage claim, by definition, presents a means to redress an injury. Although the complaint was imprecisely drawn—Cardenas named the Attorney General in his *official capacity* as the defendant—appellant's counsel in his brief and at oral argument indicated that the underlying theory for the damages claim was that articulated in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *See also Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (recognizing a cause of action for damages from federal officials who violate the Fifth Amendment). A *Bivens* action, if successful, could result in the assessment of damages against the involved federal officials. Because these damages would be recompense for injuries suffered, the court thereby could redress Cardenas' injuries. In light of the liberal rules of federal procedure, the district court, on remand, should allow Cardenas the opportunity to amend her complaint, so as to allege properly a *Bivens*-type cause of action. *See* C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1489, at 449 (1971) (appellate court can remand with directions to allow the appellant to amend pleadings).

■ We conclude that Cardenas has satisfied the Article III standing requirements. In addition to the constitutional limitations, however, the federal courts also have developed a set of prudential principles to guide standing decisions. A party must assert his own legal rights, and must assert more than " 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." *Valley Forge Christian College,* 454 U.S. at 474–75, 102 S.Ct. at 759–60 (quoting *Warth v. Seldin,* 422 U.S. 490, 499–500, 95 S.Ct. 2197, 2205–06, 45 L.Ed.2d 343 (1975)). Moreover, "the plaintiff's complaint [must] fall within the 'zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " *Id.* 454 U.S. at 475, 102 S.Ct. at 760

(quoting *Association of Data Processing Service Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)).

This last element in the prudential standing inquiry—and the only element here at issue—has posed problems for courts and commentators. The zone of interests test has met with less than universal affection, and at least one commentator has observed that the test is "sometimes the law and usually is not." K. DAVIS, ADMINISTRATIVE LAW TREATISE ¶ 24:17, at 279 (2d ed. 1983). Although this circuit continues to adhere to that test, we have noted the difficulties involved in its application. See, e.g., *American Friends Service Committee v. Webster,* 720 F.2d 29 (D.C.Cir.1983). As we here attempt to do so, our inquiry is guided by the following principle: "The would-be plaintiff's interest in the relevant law is ascertained by injury in fact; the law's interest in the would-be plaintiff is determined by the 'zone of interests' test." *Capital Legal Foundation v. Commodity Credit Corporation,* 711 F.2d 253, 259 (D.C.Cir.1983).

We thus turn to the zone of interests test to determine whether Cardenas' interest is one protected by the Fourth or Fifth Amendments. *See, e.g., Boston Stock Exchange v. State Tax Comm'n,* 429 U.S. 318, 320 n. 3, 97 S.Ct. 599, 602 n. 3, 50 L.Ed.2d 514 (1977) (zone of interests test applied to suit brought under the commerce clause). Cardenas here asserts a right under these Amendments to be free from unreasonable interference by American officials with property that is owned by a nonresident alien and that is situated on foreign soil. To apply the zone test, we must ask whether this interest enjoys the protection of the Fourth and Fifth Amendments. We note that this inquiry tends to meld into the question of whether Cardenas has a cause of action to enforce these Amendments. *See Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Whether the question is framed as one of standing or as whether Cardenas has a cause of action, the essential inquiry is whether the plaintiffs ought to be able to invoke the constitutional guarantees in question. *See* Nichol, *Standing on the Constitution: The Supreme Court and Valley Forge,* 61 N.C.L. REV. 798 (1983); Currie, *Misunderstanding Standing,* 1981 SUP.CT.REV. 41, 43 ("Whether the answer is labeled 'standing' or 'cause of action,' the question is whether the ... Constitution implicitly authorizes the plaintiff to sue.").

It is beyond peradventure that a foreign nonresident, non-hostile alien may, under some circumstances, enjoy the benefits of certain constitutional limitations imposed on United States actions. In more and more circumstances, federal courts have recognized the standing of nonresident aliens to invoke the protections afforded by the United States Constitution. For example, the Ninth Circuit recently held that residents of Australia have standing to raise objections under the United States Constitution to the limitations on liability imposed by the Warsaw convention. *In re Aircrash in Bali, Indonesia on April 22, 1974,* 684 F.2d 1301, 1308 n. 6 (9th Cir. 1982). Similarly, in *United States v. Toscanino,* 500 F.2d 267, *reh. denied,* 504 F.2d 1380 (2d Cir.1974), the Second Circuit held that an Italian citizen enjoyed constitutional protections when American agents kidnapped him from Uruguay. *See also United States v. Demanett,* 629 F.2d 862, 866 (3d Cir.1980) (court assumes that both American citizens and Colombian nationals aboard a vessel on the high seas protected by the Fourth Amendment), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981); *United States v. Cadena,* 585 F.2d 1252, 1262 (5th Cir.1978) (Fourth Amendment's protections can extend to aliens); *Porter v. United States,* 496 F.2d 583, 591, 204 Ct.Cl. 355, (1974) ("The just compensation clause of the Fifth Amendment has, in fact, been applied to takings of property outside the United States, even in the absence of congressional extension of the Constitution to such foreign soil."), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975); *United States v. Tiede,* 86 F.R.D. 227 (United States Court for Berlin 1979) (even abroad, conduct of American officials must be measured by

Constitution); *Berlin Democratic Club v. Rumsfeld*, ·410 F.Supp. 144 (D.D.C.1976) (nonresident alien has standing in certain circumstances). Deportation and immigration cases stand on a special footing. *See Landon v. Plasencia*, 459 U.S. 21, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, *for the power to admit or exclude is a sovereign prerogative.*") (emphasis added). Likewise, cases that address the rights of aliens during periods of war involve considerations not present here. *See Johnson v. Eisentrager*, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950).

In this circuit, the analysis of the nonresident alien's standing is in a state of evolution. An early case in this development is *Pauling v. McElroy (Pauling I)*, 278 F.2d 252 (D.C.Cir.), *cert. denied*, 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960). There, a group, including some non-American residents, sought to enjoin the testing of nuclear weapons. The court found that plaintiffs had not suffered an injury and accordingly concluded that they lacked standing. In a footnote, the court noted: "The nonresident aliens here plainly cannot appeal to the protection of the Constitution or laws of the United States." 278 F.2d at 254 n. 3. Although this dictum appears to be a blanket denial of the power of a nonresident alien to assert constitutional rights, read in context this statement suggests only that the foreign plaintiffs, like their American counterparts, could not succeed absent an allegation of a specific, actual injury. A subsequent analysis of *Pauling I* by this court comports with the limited view we take of that case. *Pauling v. McNamara (Pauling II)*, 331 F.2d 796, 798 (D.C.Cir.), *cert. denied*, 377 U.S. 933, 84 S.Ct. 1336, 12 L.Ed.2d 297 (1964) (*Pauling I* explained as holding that national policy decisions present no judicially cognizable issues). In *Kukatush Mining Corp. v. SEC*, 309 F.2d 647 (D.C.Cir.1962), this court moved away from the sweeping generalities of *Pauling I*. In *Kukatush*, the case on which the district court here relied, Canadian plaintiffs alleged that the SEC had violated the Constitution and the APA. Although the court concluded that the specific plaintiffs lacked standing, it observed that a nonresident alien could have standing if the court had jurisdiction of the subject res or if the case involved "the preferred rights under immigration laws." *Id.* at 650. Although the present litigation involves neither situation, the court in *Kukatush* indicated that the situations it identified were merely exemplary rather than all-inclusive. Most importantly, the court observed that "the decisions over the years disclose a definite trend to relax the rigidities of earlier cases." *Id.* The "relaxation of rigidities" in the area of alien standing has continued over the years. Ten years later, in *Constructores Civiles de Centroamerica, S.A. v. Hannah*, 459 F.2d 1183 (D.C.Cir.1972), the issue was not standing under the Constitution but rather standing under the APA and the Foreign Assistance Act of 1961, 22 U.S.C. § 2151 *et seq.* (1982). Although the case thus is not directly apposite, the court's dictum is highly relevant insofar as it revealed an intent to adopt a case-by-case analytical approach to standing questions that involve nonresident aliens. And, in *Sami v. United States*, 617 F.2d 755, 769 (D.C.Cir.1979), this court was willing to assume without deciding that an alien could raise a constitutional challenge to American actions within the United States that led to his arrest in Germany by German officials.

It is therefore clear that this circuit and other circuits have recognized situations in which nonresident aliens can invoke the restraints imposed by the Constitution on the American government. Yet a review of the case law fails to reveal any consistent definition of those situations, or indeed, any concise definition of that group of nonresident aliens within the Constitution's protection. Our observation in *Sami*, is as true today as when it first was made. "The extent to which the Constitution's· protections shield citizens, resident-aliens, or aliens from actions in other countries is

not clear.... Much may depend on the status of the individual complaining and the actor complained of." *Sami v. United States*, 617 F.2d at 773 n. 4.

■ Despite the lack of clarity of the law in this area, the precedents are consistent on at least one point. The universe of nonresident aliens who can invoke the Constitution is *not* limited to situations in which the res is subject to the court's jurisdiction. In many cases the location of the res, if any, has not been considered in the courts' standing analysis. *See, e.g., In re Aircrash in Bali, Indonesia on April 22, 1974, supra; United States v. Demanett, supra; United States v. Toscanino, supra.* Indeed, in this case a "res" analysis would be inappropriate since the cause of action is one for damages under a *Bivens*-type theory. And in *Kukatush*, the case upon which the district court relied, we indicated only that the presence of the res was the indicia of *one* category in which the alien had standing. Therefore, in treating the presence of the res as a necessary prerequisite to Cardenas' standing, the district court erred.

Nonetheless, we are not prepared today to conclude that Cardenas has standing to invoke the protection of the Constitution against actions of the American government. Given the difficulties and far-reaching consequences of a doctrine that enhances an alien's standing to put on a constitutional mantle, we are reluctant to apply such a rationale to a case where the complaint is broadly drawn, the facts remain obscure, and where, in any event, such a conclusion may be unnecessary to the ultimate disposition of the plaintiff's claims.

■ The predicate to Cardenas' reliance on the protections afforded by the Constitution is, of course, action by the United States government or its agent, the Attorney General. The shield of the Fourth and Fifth Amendments does not protect an individual from actions taken exclusively by foreign governments. Accordingly, if the Attorney General took no action that relates to Amparo Cardenas—for example, if, as the government avers, the request to

the Swiss only involved appellant's brother and if the American government learned of Amparo Cardenas *only* upon the receipt of the Swiss documents—then Cardenas' interests are not protected by either the Fourth or Fifth Amendments. Whatever harm Cardenas suffered may entirely be a function of Swiss actions. Claims for relief from such action cannot be addressed to an American court. Because the district court precipitously truncated appellant's discovery attempts, we are without any evidence regarding this critical threshold element. We thus are without any facts to guide our standing analysis. Accordingly, we reverse and remand.

Upon remand, the district court initially should allow discovery to the extent necessary to reveal the substance of the Attorney General's request to the Swiss. If the district court becomes satisfied that, as the government alleges, the communication only identified appellant's brother, and/or only sought *information* from the Swiss, then the case may be at an end. If, on the other hand, the district court finds that the communication implicated Cardenas herself, then the court should consider whether additional discovery is necessary so as to enable it to evaluate whether Cardenas is in that group of aliens who are the intended beneficiaries of the relevant constitutional guarantees. We intimate no opinion, however, as to whether, upon a more complete development of the facts, Cardenas will be able to establish standing.

### B. *Effect of the Treaty on Cardenas' claims.*

The government contends that the Treaty precludes judicial review of Cardenas' constitutional and APA claims. The district court accepted this argument, at least to the extent that it held that the Treaty precluded judicial review of Cardenas' claims under the Administrative Procedure Act and under the Treaty itself. We find this preclusion argument without merit as to the claims Cardenas makes that arise from elsewhere than the Treaty.

The intent to preclude review, it is argued, is evinced by certain Treaty provisions. Article 37 of the Treaty, the cornerstone of the government's argument, provides:

The existence of restrictions in this Treaty shall not give rise to a right on the part of any person to take any action in the United States to suppress or exclude any evidence or to obtain other judicial relief in connection with requests under this Treaty, except with respect to paragraph 2 of Article 9; paragraph 1 of Article 19; Article 13; paragraph 7 of Article 18; paragraph 1 of Article 25; and Articles 26 and 27.

The right to and procedures for appeal in Switzerland against decisions of Swiss authorities in connection with requests under this Treaty shall be regulated in accordance with this Treaty by domestic legislation.

In the case of any claim that a State, either as the requesting State or the requested State, has failed to comply with obligations imposed by this Treaty and as to such claim a remedy is not provided by paragraph 1 or 2, the claimant may inform the Central Authority of the other State. Where such claim is deemed by that other State to require explanation, an inquiry shall be put to the first-mentioned State; if necessary, the matter shall be resolved under Article 39.*

Reliance is also placed on Article 9 of the Treaty, which provides that "[a] search or seizure may only be made in accordance with the law of the place where the request is executed." These sections in the Treaty and in the Technical Analysis are evidence, the government argues, of an intent to preclude judicial review over all conduct connected with the Treaty's application. It is true that the above-cited provisions do indeed short-circuit any claims Cardenas makes that stem from the Treaty itself. It does not follow that the Treaty, as a superior law of the land, precludes any actions premised on the Constitution or other statute.

▮▮▮▮ A treaty may create judicially enforceable rights if the signing parties so desire. *See, e.g., Diggs v. Richardson,* 555 F.2d 848 (D.C.Cir.1976); *People of Saipan v. Department of Interior,* 502 F.2d 90 (9th Cir.1974), *cert. denied,* 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975). Here, however, it is clear that the signing parties did not intend to create judicially enforceable rights. The Technical Analysis to Article 37 explicitly provides: "[T]he restrictions in the Treaty shall not give rise to a right of any person to ... obtain judicial relief." The Treaty thus affirmatively disclaims the existence of an implied cause of action to enforce it. To the extent that Cardenas relies on an implied cause of action under the Treaty, her complaint thus was properly dismissed.

▮▮▮▮ To determine whether the Treaty precludes judicial review of those claims that do not stem from the restrictions in the Treaty, we take guidance from the analytical framework used in evaluating whether a statute precludes review. A party who argues that judicial review is precluded by a congressional enactment bears a heavy burden. *See, e.g., Environmental Defense Fund v. Hardin,* 428 F.2d 1093, 1098 (D.C.Cir.1970) ("preclusion of judicial review is not lightly to be inferred"). When constitutional rights are at

---

* The Technical Analysis provides further insight into this section:

With regard to actions in the United States Paragraph 1 provides that except for rights with respect to
(a) searches and seizures ...
(b) privileges in connection with requested testimony ...
(c) restrictions on use of testimony ...
(d) rights to question the genuineness of documents furnished pursuant to the Treaty ...
(e) limitations on compelling testimony in the requesting state ...
(f) limitations in the Treaty on the transfer of persons ...
(g) provisions in the Treaty on safe conduct of witnesses ...
the restrictions in the Treaty shall not give rise to a right of any person to take action to suppress or exclude evidence or to obtain judicial relief.
*Technical Analysis* at 63–64.

stake there is some question whether judicial review can be totally precluded. *See, e.g., Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1975); *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Johnson v. Robison,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974). In any event, judicial review is precluded only where there is clear and convincing evidence of an intent to restrict access to the courts.

A review of the Treaty as a whole, its Technical Analysis, and its purpose fails to reveal an intent to preclude judicial review. Article 37 of the Treaty, the linchpin in the government's argument to the contrary, does not contain the requisite clear and convincing evidence of an intent to foreclose judicial review. The first section of that Article provides that, with certain limited exceptions, "[t]he existence of restrictions in this Treaty shall not give rise to a right on the part of any person to take action in the United States to suppress or exclude any evidence, or to obtain other judicial relief in connection with requests under this Treaty." This section certainly does not reveal an intent to preclude judicial review over actions *not* founded on the restrictions in the Treaty. Rather, the section only prohibits a private cause of action to directly enforce the restrictions and requirements articulated in the Treaty, *see supra.*

The second section of Article 37 similarly does not evince an intent to preclude judicial review. Under that section, "[t]he right to ... appeal in Switzerland *against decisions of Swiss Authorities* in connection with requests under this Treaty shall be regulated ... by domestic regulation." (emphasis added). This provision establishes only that the right to appeal in *Switzerland* is to be governed by Swiss laws. Nothing indicates that the right to appeal is available *only* in Switzerland. Moreover, and more important, the section refers to *Swiss decisions.* The gravamen of the plaintiff's complaint is that the Americans forced the decision upon the Swiss. In other words, the wrongful decisions alleged were those of the American government, and not those of the Swiss. Thus, this part of Article 37 has no bearing upon the case before us.

A separate analysis of the Treaty's preclusion *vel non* of Cardenas' Fourth Amendment claims is necessary because the Treaty specially addresses Fourth Amendment issues. Article 9, the principal provision reflecting this special concern, states: "A search or seizure may be made only in accordance with the law of the place where the request is executed." From this provision, the government concludes that American courts cannot review Cardenas' Fourth Amendment claims. In so doing, the government overstretches the intended purpose of Article 9. As the Treaty's Technical Analysis makes clear, the Article's primary function is to delimit the procedures used in implementing requests for assistance. *Technical Analysis* at 56. Applied to the instant case, the Treaty thus requires that the Swiss act in accordance with their laws. This requirement, however, is irrelevant since Cardenas does not here suggest that the Swiss failed to comply with their procedural requirements, but argues only that the American actions preceding the Swiss search were unlawful. Equally important, the government's preclusion argument is undermined by the Article's language. Article 9 merely specifies the choice of law; it is silent as to the appropriate forum. This silence certainly cannot substitute for the clear and convincing evidence that is necessary to preclude judicial review.

■ Because we find no clear and convincing evidence that preclusion was intended, we reject the government's argument that the Treaty foreclosed judicial review of Cardenas' constitutional and statutory claims. Similarly, we conclude that our review of Cardenas' Fourth Amendment claims is not foreclosed by the Treaty. To the extent that the district court so held, we reverse its decision. Simultaneously, we affirm the dismissal of that part of her complaint that is directly based on the restrictions contained in the Treaty.

### III. CONCLUSION

For the reasons set forth above, the district court's decision is reversed in part and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*