United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 1, 2001 Decided November 16, 2001 

 No. 00-7157

 McKesson HBOC, Inc., et al., 
 Appellees/Cross-Appellants

 v.

 Islamic Republic of Iran, 
 Appellant/Cross-Appellee

 Consolidated with 
 00-7263

 Appeals from the United States District Court 
 for the District of Columbia 
 (No. 82cv00220)

 Thomas G. Corcoran, Jr. argued the cause for appel-
lant/cross-appellee. With him on the briefs was Mary-Ellen 
Noone.

 Mark N. Bravin argued the cause for appellees/cross-
appellants. With him on the briefs were Ralph N. Albright, 
Jr., Peter Buscemi and Mark R. Joelson.

 Before Edwards, Rogers and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Tatel.

 Tatel, Circuit Judge: McKesson HBOC, Inc., an American 
corporation, owns a minority interest in an Iranian dairy. 
Following Iran's 1979 Islamic Revolution, the dairy cut off the 
flow of capital and other material to McKesson, froze out 
McKesson's board members, and stopped paying McKesson's 
dividends. After years of litigation, including two appeals to 
this court, the district court granted summary judgment for 
McKesson, holding the Islamic Republic of Iran liable for 
expropriating McKesson's equity in the dairy. Following a 
bench trial on the value of McKesson's holdings, the district 
court ordered Iran to pay over $20 million in compensation 
for, among other things, expropriated equity and withheld 
dividends. In this appeal, Iran argues that federal courts 
lack jurisdiction over it, that material issues exist as to its 
liability for expropriation, and that the district court erred in 
valuing McKesson's assets. McKesson cross-appeals, chal-
lenging the district court's assessment of simple rather than 
compound interest. We affirm in most respects. Jurisdiction 
exists pursuant to the Foreign Sovereign Immunities Act's 
exception for commercial acts of a foreign sovereign that 
cause direct effects in the United States. The district court's 
careful consideration of the valuation evidence easily survives 
clear-error review. And although the district court may have 
erred in finding that international law precludes awards of 
compound interest, it acted well within its broad discretion to 
grant simple interest. But because we find that genuine 
issues of material fact exist as to whether Iranian corporate 
law excused the dairy's withholding of dividends, we reverse 
the district court's grant of summary judgment on the issue 
of Iran's liability for expropriating McKesson's equity and 
remand that portion of the case for trial.

 I.

 For many years prior to Iran's 1979 Islamic Revolution, 
McKesson HBOC, Inc., appellee and cross-appellant, contrib-
uted capital and personnel to Sherkat Sahami Labaniat Pas-
teurize Pak, an Iranian dairy ("Pak Dairy"). McKesson's 
representatives made up a majority of Pak Dairy's board of 
directors.

 Following the Revolution, McKesson's ties with Pak Dairy 
began to weaken. It no longer received its standard yearly 
dividends, and soon lost control of the dairy's board, with-
drawing its last two directors in October, 1981. Since then, 
McKesson has neither participated in Pak Dairy's business 
nor received shareholder communications or compensation for 
its investment, even though it still owns a thirty-one percent 
interest in the dairy.

 In 1982, McKesson, along with its insurer, the Overseas 
Private Investment Corporation (OPIC), filed suit in the 
United States District Court for the District of Columbia 
alleging that the Islamic Republic of Iran, appellant and 
cross-appellee, illegally expropriated McKesson's interest in 
Pak Dairy. Pursuant to Executive Order No. 12,294, 46 Fed. 
Reg. 14,111 (Feb. 24, 1981), McKesson's claim was trans-
ferred to the newly created Iran-United States Claims Tribu-
nal which, by virtue of the Algiers Accords (which settled the 
Iran hostage crisis), had exclusive jurisdiction over suits 
involving American claims to frozen Iranian assets. See 
generally Declaration of the Government of the Democratic 
and Popular Republic of Algeria, Jan. 19, 1981, Iran-U.S., 20 
I.L.M. 224. Although the Claims Tribunal decided that Iran's 
interference with McKesson's rights had not amounted to an 
expropriation by January 19, 1981, the Tribunal's jurisdiction-
al cut-off date, it did find that Pak Dairy had illegally 
withheld McKesson's 1979 and 1980 dividends. Foremost 
Tehran, Inc. v. Iran, 10 Iran-U.S. Cl. Trib. Rep. 228, 250 
(1986). The Tribunal awarded McKesson in excess of 
$900,000 as compensation for withheld dividends, plus approx-
imately $500,000 for related breach-of-contract claims. Id. at 
252-53, 254-55, 257-58.

 Renewing its claim in district court, McKesson argued that 
Iran had expropriated its equity in Pak Dairy after the 
Tribunal's jurisdictional cut-off date. Iran moved to dismiss, 
arguing primarily that the Foreign Sovereign Immunities Act 
of 1976 (FSIA), 28 U.S.C. ss 1602-1611, rendered it immune 
from suit in federal court. The district court denied this 
motion, and we affirmed in part and remanded in part. See 
Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 
F.2d 438, 449-51 (D.C. Cir. 1990) ("McKesson I"). In doing 
so, we held that McKesson had provided adequate evidence of 
federal jurisdiction pursuant to the FSIA exception for suits 
based on "commercial activity ... that ... causes a direct 
effect in the United States." 28 U.S.C. s 1605(a)(1); see 
McKesson I, 905 F.2d at 449-50. Subsequently, Iran again 
challenged federal jurisdiction, arguing among other things 
that an intervening Supreme Court decision, Republic of 
Argentina v. Weltover, Inc., 504 U.S. 607 (1992), undermined 
McKesson I. McKesson Corp. v. Islamic Republic of Iran, 
52 F.3d 346, 349 (D.C. Cir. 1995) ("McKesson II"). Distin-
guishing Weltover and deferring to McKesson I, we affirmed 
the district court's denial of Iran's renewed motion to dismiss. 
Id. at 350-51.

 With the jurisdictional issue seemingly--though as we shall 
soon see, not finally--resolved, both parties moved for sum-
mary judgment on liability. Granting summary judgment for 
McKesson, McKesson Corp. v. Islamic Republic of Iran, No. 
82-220, mem. op. at 31 (D.D.C. June 23, 1997), the district 
court scheduled a bench trial to determine damages. Just 
before trial, Iran once again moved to dismiss for lack of 
jurisdiction, arguing that the International Guaranty Agree-
ment (IGA), which governs the resolution of claims against 
Iran to which the United States government and its instru-
mentalities are subrogated, requires arbitration rather than 
litigation. The district court denied the motion, heard several 
weeks of testimony on valuation, and then issued findings 
valuing McKesson's assets--including equity in Pak Dairy, 
dividends, and simple interest--at just over $20 million. 
McKesson Corp. v. Islamic Republic of Iran, No. 82-220, 
mem. op. at 53 (D.D.C. May 26, 2000). The district court 

denied McKesson's subsequent motion for reconsideration of 
the court's assessment of simple rather than compound inter-
est. McKesson Corp. v. Islamic Republic of Iran, No. 
82-220, mem. op. at 13 (D.D.C. Sept. 28, 2000).

 Iran now appeals the grant of summary judgment on 
liability as well as the district court's valuation of McKesson's 
holdings in Pak Dairy. Iran also appeals the district court's 
rejection of its FSIA and IGA jurisdictional arguments. 
McKesson cross-appeals the denial of its motion for reconsid-
eration of the decision to award only simple interest.

 II.

 We begin with Iran's jurisdictional arguments. A foreign 
nation's entitlement to sovereign immunity raises questions of 
law reviewable de novo. Princz v. Fed. Republic of Germa-
ny, 26 F.3d 1166, 1169 (D.C. Cir. 1994).

 The FSIA immunizes foreign sovereigns, as well as their 
agents and instrumentalities, from federal court jurisdiction, 
see 28 U.S.C. ss 1603(a), 1605, unless the case falls within one 
of several exceptions specified in the act, see id. s 1605; see 
also Argentine Republic v. Amerada Hess Shipping Corp., 
488 U.S. 428, 443 (1989) ("[T]he FSIA provides the sole basis 
for obtaining jurisdiction over a foreign state in the courts of 
this country...."). McKesson argues, and the district court 
held, that jurisdiction over Iran exists pursuant to the FSIA's 
exception for "any case ... in which the action is based upon 
a commercial activity ... of the foreign state ... that ... 
causes a direct effect in the United States." 28 U.S.C. 
s 1605(a)-(b).

 This court has twice considered whether the commercial-
activity exception applies to McKesson's claim, holding both 
times that the alleged effects of Iran's expropriation--includ-
ing the cut-off of the "constant flow of capital, management 
personnel, engineering data, machinery, equipment, materials 
and packaging" between the two companies, McKesson I, 905 
F.2d at 451, as well as the abrupt end of "McKesson's role as 
an active investor," McKesson II, 52 F.3d at 350--were 
sufficiently direct to create federal jurisdiction. It is true, as 

Iran stresses, that our two earlier decisions found McKes-
son's jurisdictional showing sufficient only to survive a motion 
to dismiss, id. at 351, whereas this time we review a district 
court order granting summary judgment. Though we do not 
here assume the validity of McKesson's factual assertions, see 
United States v. Gaubert, 499 U.S. 315, 327 (1991), this 
distinction makes no difference, for Iran does not dispute the 
particular facts on which our two earlier decisions relied. 
Indeed, the district court, reviewing the record without obli-
gation to assume the veracity of either party's assertions, 
cited the same facts that McKesson I and McKesson II found 
sufficient for "direct effects" jurisdiction. See McKesson 
Corp. v. Islamic Republic of Iran, No. 82-220, mem. op. at 10 
n.10 (D.D.C. June 23, 1997). Because we are presented with 
jurisdictional facts identical to the ones relied on by our two 
earlier decisions, and because Iran does not challenge the 
veracity of those facts (it challenges only their sufficiency), 
the "law of the case" doctrine requires us to follow those two 
decisions. McKesson II, 52 F.3d at 350 ("[L]aw-of-the-case 
doctrine holds that decisions rendered on the first appeal 
should not be revisited on later trips to the appellate court.") 
(quoting Crocker v. Piedmont Aviation, Inc., 49 F.3d 735 
(D.C. Cir. 1995)) (internal quotation marks omitted). As we 
said in McKesson I, "the alleged effects of freezing-out Amer-
ican corporations in their ownership of Pak Dairy are at least 
as substantial and direct as effects alleged in prior cases in 
which this court and other circuits have found 'direct ef-
fects.' " McKesson I, 905 F.2d at 451.

 Iran argues that even if some elements of its expropriation 
had direct effects in the United States, federal courts may not 
exercise jurisdiction over one particular aspect of that claim: 
Pak Dairy's withholding of McKesson's dividends. In sup-
port of this proposition, Iran argues first that in Kingdom of 
Saudi Arabia v. Nelson, 507 U.S. 349 (1993), the Supreme 
Court established an exclusionary principle under which no 
fact that could not have independently served as grounds for 
jurisdiction may serve as a basis for a foreign state's liability, 
and second, that the "direct effects" exception to claims based 
on commercial transactions does not apply where, as here, the 

place of payment lies outside the United States. In our 
view, the first argument has no merit, thus rendering the 
second irrelevant. Nelson held that commercial-activity 
jurisdiction cannot exist unless the commercial activity 
that forms the basis for jurisdiction also serves as the predicate
for the plaintiff's substantive cause of action. See 507 
U.S. at 357-58. Here, McKesson's extensive showing of 
direct effects flowing from the commercial activity on which 
its cause of action rests establishes the nexus found lacking in 
Nelson. Regardless of whether denial of dividends alone 
would give rise to federal court jurisdiction under the FSIA's 
commercial-activity exception, because the net effect of Pak 
Dairy's cut-off of commercial ties included not just nonpay-
ment, but also the cessation of "the flow of capital, manage-
ment personnel, engineering data, machinery, equipment, ma-
terials and packaging," McKesson I, 905 F.2d at 451, the 
district court rightly considered the dividends issue in both in 
determining that Iran had expropriated McKesson's equity 
interest and in awarding damages for that expropriation.

 Iran's alternative jurisdictional argument rests on the In-
ternational Guaranty Agreement's arbitration clause: "[A]ny 
claim against the Government of Iran to which the Govern-
ment of the United States may be subrogated as a result of 
any payment under such guaranty shall be the subject of 
direct negotiation between the two Governments." Agree-
ment on Guaranty of Private Investments, Sept. 17, 1957, 
U.S.-Iran, 8 U.S.T. 1599, 1600-01. According to Iran, this 
clause applies to OPIC's claims because OPIC insured 
McKesson's interest in Pak Dairy, thus precluding federal 
court jurisdiction. Acknowledging that OPIC is a govern-
ment instrumentality within the meaning of the IGA, McKes-
son argues that Iran has waived its IGA argument. As 
McKesson points out, Iran has actively litigated this case for 
nine years, never once mentioning the arbitration clause nor 
attempting to begin IGA arbitration proceedings. Iran re-
sponds that subject-matter jurisdiction cannot be waived.

 We need not determine whether Iran waived this defense, 
however, for in our view, although the IGA might well bar 

OPIC from proceeding, it has no effect on the district court's 
jurisdiction over McKesson's claims. Even though OPIC has 
compensated McKesson for part of its loss, McKesson still 
owns title to its equity in Pak Dairy and to its unpaid 
dividends, and it is well-settled that where an insured party 
holds title to confiscated property, the title holder is the 
appropriate party to bring a claim for compensation. See 
Mobile & Montgomery Ry. Co. v. Jurey, 111 U.S. 584, 593 
(1883); Foremost Tehran, 10 Iran-U.S. Cl. Trib. Rep. at 239 
("[T]he governing law of the settlement agreements, that of 
the District of Columbia, ... like other common law systems, 
provides that an insured party who assigns a limited interest 
to its insurer is the proper party to bring a claim for 
compensation for the entire loss."); Restatement (Second) of 
Trusts s 280 (1959). The settlement agreement between 
McKesson and OPIC states that McKesson will "maintain the 
legal title in and to all of the aforesaid items for the benefit of 
and in trust for OPIC." Foremost Tehran, 10 Iran-U.S. Cl. 
Trib. Rep. at 238-39 (quoting August, 1981 settlement agree-
ment between OPIC and McKesson). Relying on this lan-
guage, the Claims Tribunal held that McKesson "is legally 
entitled to pursue a claim for recovery of the insured portion 
of its losses as well as the uninsured portion.... [R]ecovery 
by [McKesson] of a measure of compensation from its insur-
ers cannot affect its title to the claim against [Iran]." Id. at 
239. The IGA thus presents no bar to federal court jurisdic-
tion in this case.

 III.

 This brings us to Iran's contention that the district court 
prematurely granted summary judgment on liability in 
McKesson's favor. A court may grant summary judgment 
only when it finds "no genuine issue as to any material fact 
and ... the moving party is entitled to judgment as a matter 
of law." Fed. R. Civ. P. 56(c). To defeat a motion for 
summary judgment, the opposing party (for purposes of this 
issue, Iran) must demonstrate the existence of disputed issues 
by reference to affidavits or other materials that "set forth 
specific facts showing that there is a genuine issue for trial." 

Fed. R. Civ. P. 56(e). The court must resolve any doubts and 
make all reasonable inferences in favor of the opposing party. 
Abraham v. Graphic Arts Int'l Union, 660 F.2d 811, 814-15 
(D.C. Cir. 1981). We review grants of summary judgment de 
novo. Summers v. Dep't of Justice, 140 F.3d 1077, 1078 (D.C. 
Cir. 1998).

 Iran first challenges the district court's conclusion that an 
agreement between Iran and the United States, the 1955 
Treaty of Amity, gave McKesson a right to recover its 
expropriated property. Although treaties are the "supreme 
Law of the Land," U.S. Const. art. VI, cl. 2, they provide no 
basis for private lawsuits unless implemented by appropriate 
legislation or intended to be self-executing, see Tel-Oren v. 
Libyan Arab Republic, 726 F.2d 774, 808 (D.C. Cir. 1984) 
(Bork, J., concurring), cert. denied, 429 U.S. 835 (1976). If a 
treaty contains language clearly indicating its status as self-
executing, courts regard that language as conclusive. See 
Cardenas v. Smith, 733 F.2d 909, 918 (D.C. Cir. 1984); see 
also Tel-Oren, 726 F.2d at 809 (Bork, J., concurring) (noting 
that treaties that "speak in terms of individual rights" may be 
regarded as self-executing). The Treaty of Amity contains 
just such language: It explicitly creates property rights for 
foreign nationals, see Treaty of Amity, Economic Relations, 
and Consular Rights, Aug. 15, 1955, U.S.-Iran, art. IV, cl. 2, 8 
U.S.T. 899, 903 ("[P]roperty [of foreign nationals] shall not be 
taken except for a public purpose, nor shall it be taken 
without just compensation."), and contemplates judicial en-
forcement of those rights, see id. art. IV, cl. 1 ("Each High 
Contracting Party ... shall assure that [the] lawful contrac-
tual rights [of foreign nationals] are afforded effective means 
of enforcement....").

 Iran does not dispute that the Treaty of Amity creates 
enforceable rights, but instead contends that its clause stating 
that "[p]roperty of nationals and companies of either High 
Contracting Party, including interests in property, shall re-
ceive the most constant protection and security within the 
territories of the other High Contracting Party ... ," Treaty 
of Amity art. VI, cl. 2, only "confers a right of action on an 
Iranian citizen in a U.S. court," Appellant's Opening Br. at 30. 

As the district court convincingly observed, however, al-
though this language suggests that one party will receive 
protections within the territory of the other party, it doesn't 
say that those protections can only be enforced in the territo-
ry of the other party. McKesson Corp. v. Islamic Republic 
of Iran, No. 82-220, mem. op. at 27-26 (D.D.C. June 23, 
1997). Such a limited interpretation, moreover, flatly con-
flicts with the treaty's purpose--protecting property of U.S. 
nationals--particularly because Iran's post-revolutionary 
courts cannot provide adequate remedies for U.S. claims. 
See Rockwell Int'l Systems, Inc. v. Citibank, N.A., 719 F.2d 
583, 587-88 (2d Cir. 1983) (noting that federal courts have 
"consistently rejected" the proposition that the post-
revolutionary Iranian court system can afford adequate reme-
dies to U.S. claimants).

 Iran next argues that summary judgment was inappropri-
ate because it raised genuine issues of material fact as to 
whether Pak Dairy's refusal to pay McKesson's dividends was 
justified by McKesson's failure to comply with Iranian corpo-
rate law--specifically, the requirement that shareholders 
must "come to the company" to collect their dividends. 
Though skeptical of this requirement, the district court grant-
ed summary judgment because, even if the requirement 
existed, McKesson's compliance with it would have been 
futile. This is a tricky issue, but reviewing the record 
ourselves, we think Iran has raised genuine issues of material 
fact sufficient to survive summary judgment on liability.

 We begin with Iran's contention that its corporate law 
requires shareholders to "come to the company"--that is, to 
physically appear at a company's office--in order to collect 
dividends. McKesson argues that this requirement merely 
reflects non-binding custom and therefore that it could not 
excuse Pak Dairy's non-payment of dividends. This issue, 
like all determinations of foreign law, may be resolved at 
summary judgment. See Fed. R. Civ. P. 44.1; 9 Charles 
Wright & Arthur R. Miller, Federal Practice and Proce-
dure s 2446, at 656-58 (2d ed. 1995).

 Iran's numerous affidavits suggest that in Iran, "it is 
assumed that there is a legal requirement of physically 

appearing at the company with a receipt. In a proceeding in 
an Iranian court, the proponent of the argument that an 
Iranian company was required to pay dividends in any other 
way would be put to a very heavy burden of proof and every 
inference would be taken against him." Fakhari Aff. IV p 9. 
Iran's affidavits also show that where a "come to the compa-
ny" requirement prevails, a corporation may not be held 
liable for nonpayment unless and until it denies a sharehold-
er's valid, in-person request for dividends. See Fakhari Aff. I 
p 13; Fakhari Aff. II p 3. The affidavits, however, fall short 
of proving that this general practice reflects a legal require-
ment applicable to all Iranian corporations. Indeed, Iran's 
experts unanimously state that whatever the prevailing cus-
tom and practice, Iranian law, reflected in Article 57 of Iran's 
Commercial Code, permits corporate boards to select any 
method of disbursing dividends. See Dadyar Aff. I p 7; 
Fakhari Aff. I p 14.

 Thus, while we agree with the district court that no general 
principle of Iranian corporate law excuses Pak Dairy's with-
holding of McKesson's dividends due to its failure to come to 
the company, the record contains testimony that Iranian law 
permitted Pak Dairy's board of directors to adopt such a 
binding requirement. To survive summary judgment, then, 
Iran need only make a credible showing that Pak Dairy 
exercised its discretion to implement a "come to the compa-
ny" requirement. We think it has made such a showing. 
Pak Dairy's chief accountant states in his affidavit that "divi-
dends are paid to shareholders by means of a cheque, and the 
shareholders must come to Pak Dairy to receive the cheque. 
The cheque is delivered to the shareholder against his receipt 
in the Company's documents, especially prepared for this 
purpose after his identity and ownership is established by the 
Company's officials." Dadyar Aff. I p 7. The chief accoun-
tant further characterized this policy as "the mode of pay-
ment chosen by Pak Dairy ... [s]ince long ago, in particular 
in 1981 and 1982 and up to the present." Dadyar Aff. II p 2.

 Calling these affidavits "self-serving, vague, and uncorrob-
orated," McKesson argues that they are insufficient to estab-
lish a genuine issue of material fact. Appellee's Opening Br. 
at 26. It is true that the chief accountant's affidavits refer to 
no documents supporting his assertions, and that we have 
held under some circumstances--for example, in Doe v. 
Gates, 981 F.2d 1316 (D.C. Cir. 1993)--that a party relying on 
unsupported affidavits cannot survive summary judgment. 
The inadequate affidavit in Gates--submitted by the plaintiff 
in a discrimination case--had two critical defects not present 
here: The plaintiff-affiant had no direct knowledge of compa-
ny policy, and the defendant had made an extensive showing 
that no discriminatory policy existed. Id. at 1322-23; see 
also id. at 1323 (granting summary judgment in part because 
plaintiff failed to "provide[ ] some direct evidence of someone 
having knowledge of th[e discriminatory] policy asserting it to 
exist"). Here, Pak Dairy's chief accountant provided first-
hand testimony of his company's policy--specifically, that it 
had a "come to the company" requirement--and McKesson 
has submitted no evidence to the contrary. Under these 
circumstances, we think Iran's affidavits sufficient to preclude 
summary judgment, particularly in view of the generous 
reading we owe the opposing party's evidence at this stage.

 McKesson argues that even if Pak Dairy had a "come to 
the company" requirement, summary judgment was still justi-
fied because compliance with such a requirement would have 
been futile. The district court agreed, relying on a 1980 telex 
to McKesson in which Pak Dairy announced that it would not 
pay "any sums of money for any reason to foreign share 
holders." Telex from Pak Dairy to Foremost-McKesson 
(May 27, 1980). Although the district court acknowledged (in 
a footnote) that Pak Dairy had sent a subsequent telex in 
November, 1981 expressing "its readiness for taking proper 
measures ... [a]s regards the payment of [McKesson's] 
dividend," Telex from Pak Dairy to Foremost-McKesson 
(Nov. 11, 1981), the court dismissed the latter communication 
as merely an invitation to negotiate, which it regarded as 
"inconsequential" because "McKesson was under no legal 
obligation to settle for less than the amount to which it was 

entitled as a shareholder." McKesson Corp. v. Islamic Re-
public of Iran, No. 82-220, mem. op. at 22 (June 23, 1997). 
However plausible the district court's careful reading of the 
competing evidence, the role of the court at summary judg-
ment is not to resolve the issue, but to determine whether the 
available evidence creates a genuine issue of fact for trial. 
Abraham, 660 F.2d at 814. Moreover, the district court 
plausibly inferred that in light of ongoing negotiations pursu-
ant to the Algiers Accords, Pak Dairy's second telex repre-
sented a settlement overture, not an offer to give McKesson 
its dividends. However, because the opposite inference was 
no less plausible, the district court should have resolved the 
two competing, reasonable inferences in favor of Iran, the 
party opposing summary judgment. See Anderson v. Liberty 
Lobby, Inc., 477 U.S. 242, 255 (1986). Implying nothing about 
the relative strength of the two telexes, we think the issue 
sufficiently close to require a trial on McKesson's futility 
claim, as well as Iran's "come to the company" defense.

 IV.

 Next, Iran challenges the district court's valuation of 
McKesson's assets. Although in view of our remand, we need 
not address this issue, we will consider it because it is fully 
briefed and because resolving it now will avert a second 
appeal should McKesson prevail. See Jackson v. District of 
Columbia, 254 F.3d 262, 271 (D.C. Cir. 2001) (commenting on 
the merits of an otherwise moot issue because of the possibili-
ty that it might "arise again in a new trial"); Martini v. Fed. 
Nat'l Mortgage Ass'n, 178 F.3d 1336, 1348 (D.C. Cir. 1999) 
(same).

 A generous standard governs our review. The trial court's 
"[f]indings of fact shall not be set aside unless clearly errone-
ous, and due regard shall be given to the opportunity of the 
trial court to judge of the credibility of the witness." Fed. R. 
Civ. P. 52(a). "If the district court's account of the evidence is 
plausible in light of the record, the court of appeals may not 

reverse it." Anderson v. City of Bessemer, 470 U.S. 564, 573-
74 (1985).

 The district court's careful consideration of the evidence 
and testimony on valuation easily survives this highly defer-
ential standard. Not only do the district court's valuation 
findings fall well within the realm of plausibility, but in 
reaching them the court relied heavily on its own assessment 
of the credibility of the two competing expert witnesses. 
Such findings, the Supreme Court has warned, "can virtually 
never be clear error." Id. at 574.

 Only two of Iran's challenges require even brief consider-
ation. First, Iran claims that the district court erred when 
calculating the amount of its award by converting rials to 
dollars at the official exchange rate prevailing at the time of 
the expropriation. According to Iran, the district court 
should have used a different, "open market" exchange rate. 
To the extent that this argument applies to the valuation of 
McKesson's equity, Iran is estopped from arguing that the 
district court committed reversible error because its own 
expert witness used the official exchange rate in converting 
rials to dollars in his equity valuation. See Georgetown 
Manor, Inc. v. Ethan Allen, Inc., 991 F.2d 1533, 1539-40 
(11th Cir. 1993) ("[I]t is a 'cardinal rule' of appellate proce-
dure 'that a party may not challenge as error a ruling or 
other trial proceeding invited by that party.' ") (citation omit-
ted). To the extent that the argument applies to the district 
court's valuation of McKesson's dividends, we think the dis-
trict court's decision to use the official--rather than an "open 
market"--exchange rate rests on more than enough evidence 
to survive clear-error review. Particularly convincing to us, 
the district court relied on decisions of the Iran-U.S. Claims 
Tribunal, which invariably used the official exchange rate in 
converting rials to dollars. McKesson Corp. v. Islamic Re-
public of Iran, No. 82-220, mem. op. at 45 (D.D.C. May 26, 
2000).

 Second, Iran claims that the district court erred by award-
ing McKesson the value of its 1982 dividend without reducing 

its equity valuation by the same amount. Again, this argu-
ment is barred by estoppel: Iran's trial evidence--including 
the submissions of its own expert witness--failed to deduct 
the 1982 dividend from its proposed valuation. In any event, 
no double-counting occurred. Both experts valued McKes-
son's equity by projecting Pak Dairy's 1982 earnings into the 
future, McKesson Corp. v. Islamic Republic of Iran, No. 
82-220, mem. op. at 45 (D.D.C. May 26, 2000), while the 1982 
dividend was based on Pak Dairy's 1981 earnings.

 V.

 In its cross-appeal, McKesson challenges the district 
court's assessment of simple rather than compound interest. 
According to McKesson, the district court erred by holding 
that in light of its "finding that the clear majority of interna-
tional courts have historically awarded only simple interest," 
McKesson Corp. v. Islamic Republic of Iran, No. 82-220, 
mem. op. at 2 (Sept. 28, 2000), customary international law 
required such an award. We review determinations of inter-
national law de novo. See Echeverria-Hernandez v. INS, 923 
F.2d 688, 692 (9th Cir. 1991) (applying de novo review to 
question of international law), vacated on other grounds by 
946 F.2d 1481 (9th Cir. 1991); see also Fed. R. Civ. P. 44.1 
("[A]n issue concerning the law of a foreign country ... shall 
be treated as a question of law.").

 McKesson argues that the district court had no discretion 
to award simple interest. For this proposition, McKesson 
relies on the Treaty of Amity, which states that property 
belonging to nationals and companies of the United States 
and Iran "shall not be taken ... without the prompt payment 
of just compensation," and that "[s]uch compensation shall 
... represent the full equivalent of the property taken." 
Treaty of Amity, art. IV, cl. 2. In our view, however, the 
phrases "just compensation" and "full equivalent," on which 
McKesson relies, are far too ambiguous to require awards of 
compound interest.

 Although we thus reject the proposition that the Treaty of 
Amity requires compound interest, we think McKesson makes 

a convincing case that contemporary international law does 
not, as the district court seems to have thought, require 
simple interest. The only source the district court relies on 
that unequivocally states that "compound interest is not 
allowable" under international law assessed the state of that 
law over fifty years ago. Marjorie M. Whiteman, 3 Damages 
in International Law 1997 (1943). And although the Iran-
U.S. Claims Tribunal has never once awarded compound 
interest, other international tribunals have. Compare 
McKesson Corp. v. Islamic Republic of Iran, No. 82-220, 
mem. op. at 49 (May 26, 2000) ("[T]he Tribunal has never 
awarded compound interest."), and, e.g., Anaconda-Iran, Inc. 
v. Iran, 13 Iran-U.S. Cl. Trib. Rep. 199, 234-35 (1988) 
(refusing claimant's request for award of compound interest 
even though contract court was enforcing stipulated that such 
award was appropriate), with, e.g., Compania del Desarrollo 
de Santa Elena, S.A. v. Republic of Costa Rica, 39 I.L.M. 
1317, 1332-34 (Int'l Ctr. for Settlement of Inv. Disputes 2000) 
(awarding compound interest), and Kuwait v. Am. Indep. Oil 
Co. (Aminoil), 21 I.L.M. 976, 1042 (1982) (same). Indeed, 
most contemporary sources, including the authority relied on 
most heavily by Iran, take the view that "although compound 
interest is not generally awarded under international law or 
by international tribunals, special circumstances may arise 
which justify some element of compounding as an aspect of 
full reparation." James Crawford, Third Report on State 
Responsibility Submitted to the International Law Commis-
sion of the United Nations, 2 Y.B.I.L.C. 50 (2000).

 Accordingly, although customary international law may fa-
vor awards of simple interest, we think the district court 
erred in holding that it requires such awards. Had the 
district court relied solely on this holding, reversal might 
have been appropriate. In denying McKesson's motion for 
reconsideration, however, the district court held that "even if 
customary international law authorizes an award of compound 
interest at the discretion of the awarding body, this Court 
finds that the almost uniform practice of awarding only 
simple interest is a relevant and compelling consideration in 

the exercise of that discretion." McKesson Corp. v. Islamic 
Republic of Iran, No. 82-220, mem. op. at 12 (Sept. 28, 2000).

 Reviewing this element of the district court's rejection of 
McKesson's motion for reconsideration only for abuse of 
discretion, see Anyanwutaku v. Moore, 151 F.3d 1053, 1058 
(D.C. Cir. 1998), we find none. It is true, as McKesson points 
out, that some federal common-law principles require courts 
to "make the plaintiff whole." Appellee's Opening Br. at 65. 
Even if these principles support awards of compound interest 
in tort cases, however, they fall well short of proving that the 
district court abused its discretion, particularly in light of the 
court's reliance on a far more relevant authority: the deci-
sions of the Claims Tribunal, which invariably awards simple 
interest.

 VI.

 We affirm the district court's holdings that federal courts 
have subject-matter jurisdiction over Iran under the FSIA's 
commercial-activity exception, that the IGA does not preclude 
federal jurisdiction over McKesson's claims, and that the 
Treaty of Amity gives McKesson a right to recover its 
expropriated property. We reverse the district court's sum-
mary judgment in favor of McKesson on liability and remand 
for trial on the "come to the company" and futility issues. 
The district court's valuation of McKesson's assets and its 
assessment of simple interest are affirmed to the extent that 
those judgments are not rendered moot after trial.

 So ordered.