**DKT MEMORIAL FUND LTD., et al., Plaintiffs,**

v.

**AGENCY FOR INTERNATIONAL DEVELOPMENT, et al., Defendants.**

**Civ. A. No. 85–1668.**

United States District Court, District of Columbia.

July 1, 1988.

Motion to Alter Judgment Granted in Part and Denied in Part July 20, 1988.

Richard A. Frank, Michael E. Fine, Powell, Goldstein, Frazer & Murphy, Washington, D.C., for plaintiffs.

James L. Spears, Acting Asst. Atty. Gen., Timothy J. Reardon, Acting U.S. Atty., David J. Anderson, Director, Neil H. Koslowe, Special Litigation Counsel, Civ. Div., U.S. Dept. of Justice, Washington, D.C. (Howard M. Fry, General Counsel, Stephen R. Tisa, Atty., Agency for Intern. Development, Washington, D.C., of counsel), for defendants.

## OPINION

JUNE L. GREEN, District Judge.

This matter is before the Court on cross-motions for summary judgment. The plaintiffs, one domestic and two foreign nongovernmental organizations ("NGO's"), challenge the lawfulness of the Agency for International Development's ("AID") implementation of the Policy Statement of the United States of America at the United Nations International Conference on Population in Mexico in August 1984 ("Mexico City Policy Statement"). The Policy provides that the United States not contribute funds to foreign NGO's that perform or actively promote abortion as a method of family planning abroad, even if the NGO's engage in these abortion-related activities with their own non-AID funds. AID implemented the Policy by drafting new clauses for insertion in its grants and agreements.

The plaintiffs seek a declaratory judgment that AID's implementation of the Policy (1) is inconsistent with, and in excess of, the Foreign Assistance Act of 1961 ("FAA"), 22 U.S.C. § 2151 (1982), and the Continuing Appropriations Act of 1985, Pub.L. No. 98-473, 98 Stat. 1888; (2) is a violation of the plaintiffs' first and fifth amendment rights; and (3) is arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 (1982). The plaintiffs also seek an order enjoining AID's implementation of the Policy.

## I. STATEMENT OF FACTS

AID provides funds through family planning grants and cooperative agreements to international agencies, foreign governments, and foreign and domestic NGO's. A potential AID grantee must submit a written application and agree to comply with the grant conditions. AID evaluates

applications for funds under a variety of criteria, many of which are set forth in the AID Handbook 13, entitled Grants.

On July 13, 1984, the White House issued the Mexico Policy Statement, which guided the United States delegation to the United Nations International Conference on Population during August 6–13, 1984. This statement announced a new U.S. policy with respect to the funding of certain organizations which promote or perform abortions in foreign countries as a method of family planning. It provided in relevant part:

> [T]he United States does not consider abortion an acceptable element of family planning programs and will no longer contribute to those of which it is a part. Accordingly, when dealing with nations which support abortion with funds not provided by the United States Government, the United States will contribute to such nations through segregated accounts which cannot be used for abortion. Moreover, the United States will no longer contribute to separate nongovernmental organizations which perform or actively promote abortion as a method of family planning in other nations.
>
> . . . .
>
> U.S. Government authorities will immediately begin negotiations to implement the above policies with the appropriate governments and organizations.

After the Mexico City Policy Statement was issued, AID drafted new standard provisions for insertion in family planning grants and cooperative agreements. The new provisions revised portions of Handbook 13 and were designed to implement the policy standards. These amended standards form the gravamen of the plaintiffs' complaint.

The most recent version of these standards is found in Handbook 13, effective June 19, 1987. Foreign NGO's must certify that they "[d]o not perform or actively promote abortion as a method of family planning in AID-recipient countries and [do] not provide financial support to any other foreign [NGO] that conducts such activities." Handbook 13 at 4C–49(d)(3)(i).

In addition, the foreign NGO must certify that while receiving assistance under the grant, it will not perform or actively promote abortion or provide financial support to other foreign NGO's that conduct such activities. *Id.* at (d)(4)(i). Domestic NGO's are not required to make this certification. Instead, they must agree that they "will not furnish assistance for family planning under this grant to any foreign [NGO] which performs or actively promotes abortion as a method of family planning in AID-recipient countries or which provides financial support to any other foreign [NGO] that conducts such activities." *Id.* at (d)(1).

Plaintiff DKT Memorial Fund, Ltd. ("DKT") is a nonprofit, nongovernmental organization incorporated under the laws of the State of New York. DKT finances and collaborates with other organizations in various family planning programs which include voluntary abortion services and the dissemination of information regarding the availability of those services.

Plaintiff Parivar Seva Sanstha ("PSS") is a nonprofit, nongovernmental society based in New Delhi, India, and registered under the Societies Registration Act of India. PSS operates family planning clinics in India, each of which provides a comprehensive range of services including abortion and the dissemination of information regarding abortion.

Plaintiff Population Services Family Planning Programmes Ltd. ("PSE" for Population Services Europe) is a nonprofit charity registered in the United Kingdom and a member of the International Council of Voluntary Agencies, with its principal base of operations in London, England. PSE provides technical assistance in the operation of comprehensive family planning clinics around the world. PSE engages in certain activities relating to voluntary abortion services and the dissemination of information regarding the availability of such services.

None of the plaintiffs has ever applied to AID for a family planning grant. They planned to apply to AID for funding for a four-year comprehensive family planning

project that they jointly undertook in the rural districts of Uttar Pradesh, India (the "Uttar Pradesh Project"). The Uttar Pradesh Project does not provide, or otherwise involve, abortion services or involuntary sterilization. DKT would serve as the project manager; PSS would be the implementing agency, and PSE would provide technical assistance.

The plaintiffs contend that AID's implementation of the Mexico City Policy Statement conflicts with the statutory scheme established by Congress in the FAA, violates the plaintiffs' first and fifth amendment rights, and is arbitrary and capricious.

The defendants claim that all three of the plaintiffs lack standing to bring this suit and that the challenged clauses do not violate any congressional policies or any of the plaintiffs' first or fifth amendment rights.

## II. CONCLUSIONS OF LAW

A. *Standing*

This Court originally granted AID's motion for summary judgment, finding that the plaintiffs lacked standing because they could not show injury in fact. *DKT Memorial Fund, Ltd. v. AID*, 630 F.Supp. 238 (D.D.C.1986). During argument before the Court of Appeals for the District of Columbia Circuit, counsel for the plaintiff-appellants orally moved to amend the appellants' complaint to add the affirmative allegation that, but for the Policy, the appellants would be eligible to receive AID funds. *DKT Memorial Fund, Ltd. v. AID*, 810 F.2d 1236, 1239 (D.C.Cir.1987). The Court of Appeals granted the appellants' motion to amend and stated that "[i]t follows that the burden of going forward is on the government to traverse appellants' allegations of eligibility other than on the policy grounds *sub judice*." *Id.* The Court of Appeals reversed and remanded for the district court's further consideration on the issue of standing in light of the amended complaint. *Id.*

Article III restricts the business of the federal courts to the resolution of actual "cases" and "controversies" presented in an adversarial context and in a form which is capable of judicial determination. *See Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 1949–50, 20 L.Ed.2d 947 (1968). The threshold inquiry, therefore, is "whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975).

Although the contours of Article III standing are at times uncertain and shifting, the fundamental focus of standing has remained constant. *Flast*, 392 U.S. at 95, 97–99, 88 S.Ct. at 1951–52. In order to have standing, a party must "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). The injury must be fairly traceable to the challenged action and "likely to be redressed by a favorable decision." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925–26, 48 L.Ed.2d 450 (1976).

None of the plaintiffs has either applied directly to AID for funds or been rejected for funding. However, the Supreme Court has recognized that nonapplicants, who are otherwise qualified, may have standing to challenge a disqualifying statute or regulation. *See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). In *Arlington Heights*, one plaintiff asserted that the local government's refusal to rezone land to permit the construction of low-and-moderate-income housing denied him the opportunity to obtain housing in Arlington Heights. Even though that plaintiff had not applied for housing and could not show that he, rather than another, would have been selected for the housing, the Supreme Court found that he had standing. All the plaintiff alleged in his complaint was that he sought and would qualify for housing. *Id.* at 264, 97 S.Ct. at 562–63.

When the plaintiffs in the present action amended their complaint, they added the following allegation: "But for the abortion eligibility policy, plaintiffs would be eligible to apply and to compete for and, if successful, to receive AID funds."[1] During oral argument of the summary judgment motions, the Court asked the defendants if they could state for the Court that the plaintiffs were not eligible to compete for AID funds, absent the abortion policy. Although there were some questions about the plaintiffs' accounting systems,[2] the defendants could not state that the plaintiffs were not eligible to compete for funds. It follows that the defendants did not carry their burden of traversing the plaintiffs' allegations of eligibility.

### 1. *DKT Memorial Fund*

■ The defendants claim that DKT has not suffered any injury as a result of the AID clauses since DKT is a domestic NGO. Domestic NGO's are not required by the AID clauses to certify that they neither perform nor actively promote abortions before they are eligible to compete for an AID family planning grant or agreement. The defendants point out that DKT is free to compete for funds, even if it performs or promotes abortions. They claim that DKT can still use its own funds to collaborate with foreign NGO's that use or counsel abortion as family planning. They also state that the impact of the AID restrictions on DKT, when dealing with foreign NGO's, is "so remote and speculative that it cannot constitute any cognizable injury to DKT."[3]

This argument, however, ignores the basis for applying for AID funds. The domestic NGO cannot be viewed in a vacuum. DKT's purpose in seeking AID funds is to administer the Uttar Pradesh Project in India by using foreign NGO's. The AID restrictions bar any domestic NGO from collaborating with any foreign NGO that performs or actively promotes abortion as a method of family planning, even if the foreign NGO's are using their own funds. This scenario is neither remote nor speculative. If DKT could use its own funds for these projects, it would not need to seek them from AID.

DKT suffers a direct injury as a result of the AID restrictions. DKT is not eligible to compete for AID funds whenever it plans to use those funds with foreign NGO's like PSE and PSS. This injury of ineligibility to compete for or receive AID funds is directly traceable to the AID restrictions as they are the actual bar. As DKT alleges, "but for" the abortion eligibility policy, it would be eligible to apply and to compete for AID funds. A favorable decision would redress this bar. The plaintiffs need not show that they are certain to receive funding. *See West Virginia Ass'n of Community Health Centers v. Heckler*, 734 F.2d 1570, 1576 (D.C.Cir. 1984). A favorable decision will not guarantee this funding, but it will enable DKT to compete for AID funds that are to be used in conjunction with foreign NGO's that perform or actively promote abortion as a method of family planning.

■ The Court of Appeals for the District of Columbia Circuit also follows the "zone of interests" test, one of the prudential principles set out by our Supreme Court. The interest sought to be protected

---

**1.** Amended Complaint ¶ 16.

**2.** *See* Attachment 2 of Defendants' Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("Defendants' Motion for Summary Judgment"). The plaintiffs have informed the Court that they would change their accounting systems to comply with AID requirements. The audits by AID indicated:

  a) PSS was not financially viable and that they were unable to evaluate PSS's indirect cost rates and methodology for reasonableness.

  b) PSE was financially viable, but due to not physically inspecting PSE's records, AID stated they were "unable to determine the adequacy of their accounting system and controls, reasonableness of their basis for computing of allocating overhead, and the adequacy of their property management and procurement system."

  c) DKT was also financially viable, but the same difficulties with inspecting their records caused the same conclusion as for PSE.

**3.** Defendants' Motion for Summary Judgment at 22.

by the plaintiff must be "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). The Court also stated that, "[w]here statutes are concerned, the trend is toward enlargement of the class of people who may protest administrative action." *Id.* at 154, 90 S.Ct. at 830.

The zone of interests test "requires some indicia—however slight—that the litigant before the court was intended to be protected, benefited or regulated by the statute under which suit is brought." *Copper & Brass Fabricators Council, Inc. v. Department of the Treasury,* 679 F.2d 951, 952 (D.C.Cir.1982). Our Court of Appeals has stated that " 'slight beneficiary indicia' are sufficient to sustain standing." *American Friends Serv. Comm. v. Webster,* 720 F.2d 29, 50 (D.C.Cir.1983) (citation omitted).

One of the purposes of the family planning section under the FAA is to provide assistance to developing countries in order "to reduce the rate of population growth." 22 U.S.C. § 2151b(b). Those that benefit from this assistance are government population services and NGO's. AID determines which organizations qualify for population assistance funds and DKT is one of these organizations. DKT is arguably within the zone of interests to be protected or regulated by the FAA, and as such, also by AID. Therefore, this Court finds that DKT has fulfilled the Article III requirements of standing and is before this Court properly.

### 2. *The Foreign Plaintiffs PSE and PSS*

■ The defendants rely on the "general rule that non-resident aliens have no standing to sue in United States courts." *Berlin Democratic Club v. Rumsfeld,* 410 F.Supp. 144, 152 (D.D.C.1976).[4] The defendants also claim that these plaintiffs do not fall into any of the recognized exceptions to this rule, for example:

Where the *res* at issue is within a domestic court's jurisdiction, or when a non-resident alien makes application for relief under a United States statute which permits granting the requested relief to non-resident aliens, or when a non-resident alien is brought from abroad to appear for and be the subject of a domestic criminal prosecution.

*Id.*

Although these are the general categories where nonresident aliens have been granted standing to sue in United States courts, the law in this area is not as clear-cut as the defendants would have this Court believe. The Supreme Court has not spoken affirmatively on this subject, but has stated that "[a]lien citizens, by the policy and practice of the courts of this country, are *ordinarily* permitted to resort to the courts for the redress of wrongs and the protection of their rights." *Disconto Gesselschaft v. Umbreit,* 208 U.S. 570, 578, 28 S.Ct. 337, 339, 52 L.Ed. 625 (1908) (emphasis added).

The Court stated originally that "our Constitution, laws and policies have no extraterritorial operation, unless in respect of our own citizens," *United States v. Belmont,* 301 U.S. 324, 332, 57 S.Ct. 758, 761–62, 81 L.Ed. 1134 (1937), but it recognized subsequently that "[t]his Court and other federal courts have held or asserted that various constitutional limitations apply to the Government when it acts outside the continental United States." *Reid v. Covert,* 354 U.S. 1, 8, 77 S.Ct. 1222, 1226, 1 L.Ed.2d 1148 (1957).

Under the plain language of Article III, nonresident aliens are not prohibited *per se* from bringing suit in United States courts. U.S. Const. art. III, § 2. Our own Court of Appeals has stated: "For the purposes of Article III standing, [a plaintiff's] status as a nonresident alien does not obviate the existence of [the] injury; it is the injury and not the party that determines Article III standing." *Cardenas v. Smith,* 733 F.2d 909, 913 (D.C.Cir.1984).

PSE and PSS have shown their injury in fact. As foreign NGO's they bear the full

---

**4.** *See also* Defendants' Motion for Summary  Judgment at 23.

burden of the AID restrictions since they are the organizations specifically excluded by the grant clauses. PSE and PSS are not eligible to compete for AID funds since they perform or actively promote abortion as a method of family planning. Even if PSE and PSS were subgrantees of DKT, instead of coapplicants,[5] they would still suffer the same injury of being ineligible to receive *any* AID funds as subgrantees of AID grants.

The defendants claim that PSE and PSS merely seek the privilege of receiving AID funds and that this privilege is comparable to the privilege of an alien seeking initial admission to the United States.[6] In these cases, the alien "has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982). Such a comparison fails, however, since immigration cases involve special considerations not present here. Even though PSE and PSS are non-resident aliens, their injury is sufficiently concrete to ground Article III standing.

Their injury of ineligibility to compete for or receive AID funds is directly traceable to the AID clauses. As PSE and PSS allege, "but for" the abortion eligibility policy, they would be eligible to apply and to compete for AID funds.

As a result, their injury of ineligibility will be redressed by a favorable decision since they will be allowed to apply for funds. As with DKT, PSE and PSS need not show that they are certain to receive funding. Although the defendants claim that our Court of Appeals in *Cardenas v. Smith* held "that a nonresident alien did *not* have standing to obtain declaratory and injunctive relief against the Attorney General for allegedly violating the [f]ourth

[a]mendment,"[7] the basis for that ruling is not present here.

In *Cardenas,* the court would have had to order a foreign country to release bank accounts or to reverse actions already taken. *Cardenas,* 733 F.2d at 914. The United States would have been powerless to enforce an order issued directly against a foreign government. Therefore, the court could not have redressed the injury with injunctive or declaratory relief.

This Court, however, can redress these foreign plaintiffs' injuries, since the declaratory and injunctive relief would be directed against a domestic government agency, *not* a foreign government. As to whether the foreign plaintiffs are arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question, this Court finds the same general application as to DKT. Although there may be some question as to their constitutional guarantees (*see* section on first amendment), the Court finds they have standing to assert their claims under the FAA and the APA.

In *Constructores Civiles de Centroamerica, S.A. v. Hannah,* 459 F.2d 1183 (D.C. Cir.1972), our Court of Appeals found that a Honduran corporation had standing under the FAA and APA to challenge its disqualification as a bidder on a contract awarded under a loan agreement between AID and the Central American Bank for Economic Integration. The Court of Appeals relied on a statement of economic policy in the FAA and on "any person," not "any citizen" language in the APA, among other language found in both.

Although the Court of Appeals qualified its holding by limiting it to the circumstances in *Hannah,* this Court finds the same reasoning is applicable in this case. The foreign NGO's are especially within the

---

5. *See* Defendants' Statement of Genuine Issues. Although the defendants agree that there is "no genuine issue as to any material facts," they contest that the plaintiffs can apply jointly to AID for the Uttar Pradesh project. "AID does not consider grant applications jointly submitted by two or more legal entities, and it has not done so since at least 1977." *Id.* at ¶ 5; *see also* Affidavit of Kathryn Y. Cunningham at ¶ 4.

6. Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Defendants' Reply") at 10.

7. *Id.* at 10 n. 7.

zone of interests to be protected since the assistance under the FAA is directed to developing countries and their agencies. PSE and PSS are the foreign NGO's specifically barred by the AID restrictions. Accordingly, this Court finds that the foreign plaintiffs, PSE and PSS, have fulfilled the Article III requirements of standing and are before this Court properly.

### B. *The Foreign Assistance Act of 1961 ("FAA")*

■ The plaintiffs claim that the AID restrictions are inconsistent with and in excess of the congressional abortion eligibility policy established in the FAA. As a further challenge, the plaintiffs also argue that the AID restrictions are in direct conflict with other important policies of the FAA.

Throughout their argument, the plaintiffs refer to "AID's Policy." Although AID implemented the Mexico City Policy Statement through its contract clauses, the Policy was promulgated by the President, not by AID or its Administrator. This distinction is critical in reviewing the challenges to the legality of the Policy.

### 1. *Section 2151b*

Under 22 U.S.C. § 2151b(b) of the FAA, "the President is authorized to furnish assistance, on such terms and conditions as he may determine, for voluntary population planning."[8] The only limitation that Congress placed upon the President's authority under section 2151b(b) is found in section 2151b(f). Section 2151b(f) prohibits the use of federal funds for the performance of abortions, for involuntary sterilization, and for biomedical research which relates to these two activities.

The plaintiffs claim that Congress "consciously and decisively" chose only to bar the use of AID funds for these purposes.[9]

Furthermore, the plaintiffs assert that this "carefully drawn congressional policy sets the outer limits for abortion-related restrictions on eligibility for AID funds,"[10] so that additional limitations are unlawful. They also claim that the legislative history of the Helms Amendment, 22 U.S.C. § 2151b(f)(1), confirms that AID's eligibility policy conflicts with the FAA, and that the intent of Congress was to preserve the eligibility of organizations that use their own funds for abortion activities.

As support for this argument, they quote Senator Helms:

> We could, in fact, go far beyond the present amendment and require all abortion activities, from whatever funds, to be stopped before our assistance could be received. But the present amendment does not do that.

119 Cong.Rec. 32,293 (1973) (Statement of Sen. Helms).

The Court of Appeals for the Second Circuit addressed this very issue. In *Planned Parenthood Fed'n of Am. v. AID*, 838 F.2d 649, 655 (2d Cir.1988), the Second Circuit rejected this argument, finding that Senator Helms' statement "does not indicate that Congress 'has spoken' on the issue of whether limitations may be imposed on the use of non-federal funds." The court concluded that Congress "never addressed the issue of limitations on non-federal funds" and "[a]t most, Sen. Helms' statement indicates that Congress was aware that it *could* consider an amendment containing such limitations ... not that Congress considered, but chose not to adopt, such limitations." *Id.*

In addition to the language of Senator Helms, the plaintiffs point to language contained in the Conference Committee Report accompanying the 1981 amendment to the Helms Amendment:

> [T]he existing [prohibitions] on the use of AID population planning funds for [abor-

---

8. The President has delegated his authority under section 2151b(b) to the Director of the United States International Development and Cooperation Agency ("IDCA"), with certain exceptions, pursuant to Exec. Order No. 12,163, 44 Fed.Reg. 56,673 (1979). The Director of IDCA delegated that authority to the Director of AID.

IDCA Delegation No. 1, 44 Fed.Reg. 57,521 (1979), *as amended,* 45 Fed.Reg. 74,090 (1980).

9. Plaintiffs' Motion for Summary Judgment at 14.

10. *Id.* at 15.

tion-related services] ... *effectively set necessary limits* on U.S. support for international population planning programs with respect to concerns about adequate directives against promotion of abortion-related activities.

H.R.Conf.Rep. No. 413, 97th Cong., 1st Sess. 69, *reprinted in* 1981 U.S.Code Cong. & Admin.News 2404, 2506 (emphasis added). The plaintiffs claim this shows that the President's power is restricted as to limiting AID funds.

Shortly after the Mexico City Policy Statement was issued, Congress enacted the Continuing Appropriations Act, 1985, Pub.L. No. 98–473, 98 Stat. 1837 (1984). The House of Representatives expressed the following:

It is further *the sense of the House of Representatives* that ... no funds shall be denied to multilateral as well as nongovernmental and private and voluntary organizations because of their participation, paid for by funds other than those appropriated by Congress, in activities conducted in accordance with all applicable United States Federal laws and regulations.

*Id.* at 1888 (emphasis added).

However, when the House and the Senate were presented with bills [11] that would have addressed the Mexico City Policy Statement and AID's implementing clauses, both proposals were dropped in conference. H.R.Conf.Rep. No. 237, 99th Cong., 1st Sess. 118 (1985), U.S.Code Cong. & Admin.News 1985, pp. 158, 227. In fact, Rep-

resentative Smith of New Jersey remarked the next day that the exclusion of those proposals "effectively preserved the administration policy of denying funding to [NGO's] that perform or promote abortion." 131 Cong.Rec. 20,828 (1985).

This legislative history does not show that Congress intended to preserve the NGO's eligibility for AID funds when they use their own funds for abortion-related activities. Even though there have been attempts by both the House and the Senate to restrict the President's authority, this Court agrees with the Second Circuit that it amounts to no more than "congressional inaction." Had these bills passed, there would have been no question as to Congress' intent. No intent, however, can be inferred from this deadlock. Therefore, " 'absent a specific limitation on the Executive's authority to condition dispersal of United States funds to foreign NGO's, it must be assumed that Congress has left intact' the President's discretion to place conditions upon or refuse funding to such organizations." *Planned Parenthood*, 838 F.2d at 655 (quoting *Planned Parenthood v. AID*, 670 F.Supp. 538, 544 (S.D.N.Y. 1987)).

The plaintiffs also rely on the "cardinal principle of statutory construction that the more specific controls over the more general." *See First Bank v. Avenue Bank & Trust Co.*, 605 F.2d 372, 375 (7th Cir.1979) (citation omitted). They claim that subsection (f) of section 2151b specifically and explicitly addresses the subject of abortion funding and eligibility and divests AID of

---

**11.** The House bill would have amended the FAA by prohibiting the President from denying population planning assistance funds to any country or organization

because of the types of voluntary and noncoercive family planning programs which it carries out or promotes, or for which it provides funds, goods or services (directly or through another entity), so long as it does so entirely with funds other than the funds made available by the United States under this part.

H.R. 1555, 99th Cong., 1st Sess. § 304(a) (1985); *see also* H.R.Rep. No. 39, 99th Cong., 1st Sess. 37–38 (1985). The Committee on Foreign Affairs reported that the intent of the above section was to clarify U.S. policy. The committee also stated that it believed that "the policy announced by the President in July 1984, and

regulations proposed to implement that policy, *exceed the intent of the Congress and the requirements of the Foreign Assistance Act.*" H.R.Rep. No. 39 at 37–38 (emphasis added).

The Senate bill contained the following:

In determining eligibility for assistance under this subsection, the Administrator of the agency primarily responsible for administering this part shall not subject any nongovernmental or multilateral organization to *any requirement more restrictive than any requirement applicable to a foreign government* for such assistance.

S. 960, 99th Cong., 1st Sess. § 303(b) (1985); *see also* S.Rep. No. 34, 99th Cong., 1st Sess. 32 (1985), U.S.Code Cong. & Admin.News 1985, pp. 158, 191.

whatever general authority AID might otherwise have had under subsection (b). The plaintiffs point to language by our Court of Appeals: "However inclusive may be the general language of a statute, it 'will not be held to apply to a matter specifically dealt with in another part of the same enactment.... Specific terms prevail over the general in the same or another statute which otherwise might be controlling.'" *FTC v. Retail Credit Co.*, 515 F.2d 988, 993–94 n. 10 (D.C.Cir.1975) (quoting *D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 704 (1932)).

Although the Court recognizes these rules of statutory construction, they are not to be applied in the manner the plaintiffs wish them to be. Subsection (f) restricts the President's authority to furnish assistance in those situations. It does not, however, imply that the President cannot impose any other restrictions as to abortion. It merely prohibits funding as to the enumerated circumstances in subsection (f). The Court is not persuaded that the restrictions "preempt" the President's authority to "furnish assistance, on such terms and conditions as he may determine" in any circumstances other than the funding of the performance of abortions, involuntary sterilization, and for biomedical research which relates to these two activities.

### 2. *Other Policies of the FAA*

As to other policies of the FAA, plaintiffs claim that AID's eligibility policy conflicts with two important FAA policies:

a) the premium Congress placed on private sector involvement in providing family planning activities; and

b) congressional concern that U.S. assistance not intrude on the prerogative of beneficiary countries to control their own population planning activities.

Although section 2151–1(b)(8) states that the United States "should" carry out development "to the maximum extent possible through the private sector" and section 2151u(a) states that the United States' interest is that organizations "expand their overseas development efforts without compromising their private and independent na-

ture," the Court is not convinced that the AID restrictions contradict these policies. As the Second Circuit noted, there is no mandatory language contained within these policies. *See Planned Parenthood*, 838 F.2d at 654. The AID restrictions do not exclude all private sector organizations. In addition, AID is not required to use the private sector exclusively.

The Second Circuit found "[a]t most, section 2151u(a) requires only that the Government consider the private and independent nature of private organizations which it utilizes." *Id.* This Court recognizes that the AID restrictions do affect these organizations, but does not find that they compromise their "private and independent nature."

The plaintiffs also argue that AID's eligibility policy conflicts with the right of every country "to determine its own policies with respect to population growth." 22 U.S.C. § 2151b(a). The AID restrictions do not violate this policy since AID does not include the challenged clauses in grants or cooperative agreements when dealing with foreign governments. Instead, AID requires foreign governments to place U.S. funds in segregated accounts when they promote abortion in their family planning programs, as mandated by the Mexico City Policy Statement.

Therefore, this Court finds that the AID restrictions are not in excess of the congressional abortion eligibility policy established in the FAA. In addition, the Court finds that the AID restrictions are not in direct conflict with other policies found within the FAA. Recognizing the broad grant of authority accorded to the President by section 2151b(b), and finding no language further restricting the President's power other than section 2151b(f), this Court concludes that AID's implementation of the Mexico City Policy Statement is not in excess of the FAA.

### C. *The First Amendment*

■ The plaintiffs challenge AID's eligibility policy as blatantly seeking to suppress speech on abortion by nongovernmental family planning organizations.

They claim that the policy precludes organizations that wish to receive AID funds from using their own funds to

a) operate a counseling service that provides information regarding the availability of voluntary abortion services;

b) conduct a public information campaign regarding the availability of such services; and

c) lobby to legalize or maintain the legality of voluntary abortion.

*See* Plaintiffs' Motion for Summary Judgment at 32. As a result, the plaintiffs wish the Court to strike the policy as an unconstitutional effort to restrict the plaintiffs' freedom of speech and association.

### 1. *DKT Memorial Fund*

The defendants claim that AID's implementing clauses "do *not* prevent *domestic* NGO's, such as DKT, from using their own funds" for these activities. *See* Defendants' Reply at 17 (emphasis in original). This argument, however, ignores the fact that DKT's purpose in seeking AID funds is to administer the Uttar Pradesh Project in India by using foreign NGO's. It is true that DKT can use its own funds, but this misses the point. As the plaintiffs point out, "few foreign family planning programs of any magnitude can be conducted by domestic organizations without the assistance of foreign organizations." [12] By requiring the foreign NGO's to certify that they neither perform nor actively promote abortions (and by requiring domestic NGO's to agree that they will not furnish assistance to these foreign NGO's), AID is indirectly doing what it cannot do directly.

The Supreme Court has recognized that the withholding of a benefit can impinge on constitutionally protected rights.

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the govern-

ment may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." *Speiser v. Randall*, 357 U.S. 513, 526 [78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460] [ (1958) ]. Such interference with constitutional rights is impermissible.

*Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972).

As to abortions, there is no constitutional obligation to fund or promote abortion. The government "is not required to show a compelling interest for its policy choice to favor normal childbirth." *Maher v. Roe*, 432 U.S. 464, 477, 97 S.Ct. 2376, 2384, 53 L.Ed.2d 484 (1977).

Although the government may promote childbirth over abortion, it "may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307, 84 S.Ct. 1302, 1314, 12 L.Ed.2d 325 (1964). The Mexico City Policy Statement and the subsequent AID implementing clauses prohibit any funding of any foreign NGO's which "perform or actively promote abortion as a method of family planning." The United States' stance is that it does not consider abortion an acceptable element of family planning programs.

AID's implementing clauses are not "reasonable time, place, or manner regulations that serve a significant governmental interest and leave ample alternative channels for communication." *Consolidated Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530, 535, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980). The AID restrictions encom-

---

**12.** Plaintiffs' Opposition to Defendants' Motion for Summary Judgment and Reply to Defendants' Opposition to Plaintiffs' Motion for Summary Judgment at 36 ("Plaintiffs' Opposition and Reply").

pass abortion and promotion of abortion and "a constitutionally permissible time, place, or manner restriction may not be based upon either the content or subject matter of speech." *Id.* at 536, 100 S.Ct. at 2333. Since the AID restrictions bar any domestic NGO's from subgranting to foreign NGO's that "promote abortion" and promotion of abortion includes the dissemination of information regarding the availability of voluntary abortion services, the restrictions are based on the subject matter of abortion. As Justice Stevens noted, "[a] regulation of speech that is motivated by nothing more than a desire to curtail expression of a particular point of view on controversial issues of general interest is the purest example of a 'law ... abridging the freedom of speech.'" *Id.* at 546, 100 S.Ct. at 2338 (Stevens, J., concurring).

Along with the right to engage in expressive activities, is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees,* 468 U.S. 609, 622, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984) (citation omitted). The right to associate, however, is not absolute. "Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.* at 623, 104 S.Ct. at 3252 (citations omitted).

The AID restrictions impair the associational rights of DKT. In order to qualify for AID funding, PSE and PSS would be required to terminate other non-AID funded abortion programs in which DKT participates, thereby preventing DKT from implementing those programs in association with PSE and PSS. AID is in essence coercing the plaintiffs to refrain from abortion-related programs if they wish to receive AID funding, even though they are using their own funds for the abortion-related programs.

It is not clear that AID's implementation of the Mexico City Policy Statement was drawn as narrowly as possible to permit the government to control use of its funds and promote normal childbirth without infringing minimally on the exercise of constitutional rights. AID's implementing clauses could be more narrowly drawn to forbid foreign NGO's competing for AID funds from using those funds for abortion or promotion of abortion. *See, e.g., Planned Parenthood v. Arizona,* 718 F.2d 938, 944–45 (9th Cir.1983), *aff'd mem. sub nom. Planned Parenthood v. Babbit,* 479 U.S. 926, 107 S.Ct. 391, 93 L.Ed.2d 346 (1986). This can be accomplished by contributing to NGO's through segregated accounts, as AID is doing presently in its government-to-government dealings.

This conclusion and subsequent proposed solution is not an attack on the wisdom of the President's Mexico City Policy Statement. As our Court of Appeals stated: "Appellants do not seek to litigate the political and social wisdom of AID's foreign policy. They challenge the legality of AID's implementation of the Policy." *DKT,* 810 F.2d at 1238.

Although the Policy Statement is affected indirectly, "[t]he courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). The President's plenary power in foreign affairs, "of course, like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution." *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936). Even though there are "significant political overtones" in this case, resolution of these issues "cannot be evaded by courts because the issues have political implications." *INS v. Chadha,* 462 U.S. 919, 942–43, 103 S.Ct. 2764, 2780, 77 L.Ed.2d 317 (1983).

The Court concludes that AID's implementing clauses can be drawn more narrowly without sacrificing the government policy toward abortion as a method of family planning. The Court strikes the AID restrictions as an unconstitutional violation of DKT's first amendment rights.

2. *The Foreign Plaintiffs PSE and PSS*

■ The defendants claim that as nonresident aliens, PSE and PSS have no first amendment rights. On the other hand, the plaintiffs ask this Court to extend the first amendment protections to the nonresident aliens in this case.

The plaintiffs quote our Court of Appeals:

It is beyond peradventure that a foreign nonresident, non-hostile alien may, under some circumstances, enjoy the benefits of certain constitutional limitations imposed on United States actions. In more and more circumstances, federal courts have recognized the standing of nonresident aliens to invoke the protections afforded by the United States Constitution.

*Cardenas v. Smith,* 733 F.2d 909, 915 (D.C. Cir.1984).

Although the Court recognizes there are certain circumstances where nonresident aliens are afforded the protection of our Constitution, this Court is not prepared to extend them to the nonresident plaintiffs in this instance. The cases cited by the plaintiffs apply primarily to fourth amendment protections where U.S. officials are seizing nonresident aliens' property or their persons and then subjecting them to criminal prosecution.[13] The fifth amendment has also been applied to nonresident aliens where the just compensation clause has covered "takings of property located outside the United States." *Porter v. United States,* 496 F.2d 583, 591 (Ct.Cl.1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975).

It is only right that nonresident aliens are afforded the protections of our Constitution when they are subjected to criminal prosecution in our courts. Although it is conceivable that there could be instances where nonresident aliens would be afforded the protection of the first amendment, this Court is not persuaded that PSE and PSS are entitled to such protection. Both are foreign organizations that operate outside the United States. They are neither under United States control nor supervision. They have not shown sufficient ties to the United States that would justify protection by our first amendment.

Therefore, the Court finds that PSE and PSS lack standing to bring a first amendment claim in this Court.

### III. CONCLUSION

For the reasons stated above, this Court finds that AID's implementation of the Mexico City Policy Statement is not inconsistent with, and in excess of the Foreign Assistance Act of 1961. The Court does find, however, that AID's implementation of the Policy is an unconstitutional violation of the plaintiff DKT's first amendment rights of freedom of speech and association. The Court finds that AID's implementing clauses can be drawn more narrowly without sacrificing the government's policy toward abortion as a method of family planning and strikes the AID restrictions as an unconstitutional violation of DKT's first amendment rights. AID is enjoined from using these clauses in its grants and agreements. The Court also finds that the foreign plaintiffs, PSE and PSS, are not entitled to first amendment protections.

The Court did not address the plaintiffs' due process claims under the fifth amendment and their claims under the APA since the implementing clauses are being stricken as unconstitutional.

An appropriate order is attached.

### AMENDED ORDER

Upon consideration of plaintiffs' motion for summary judgment; defendants' cross-motion for summary judgment; the papers

---

13. *See United States v. Demanett,* 629 F.2d 862, 866 (3d Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981) (Colombian nationals aboard a vessel were protected by the fourth amendment); *United States v. Cadena,* 585 F.2d 1252, 1262 (5th Cir.1978) ("[O]nce we subject … aliens to criminal prosecution, they are entitled to the equal protection of all our laws, including the [f]ourth [a]mendment."); *United States v. Toscanino,* 500 F.2d 267, 280 (2d Cir.1974) ("Like the [f]ifth [a]mendment guarantee of due process, the [f]ourth [a]mendment refers to and protects 'people' rather than 'areas,' or 'citizens.'").

submitted in support of and in opposition to the motions; oral argument by counsel; the entire record herein, and for the reasons set forth in the accompanying opinion, it is by the Court this 20th day of July 1988,

ORDERED that the plaintiffs' motion is granted in part and denied in part; it is further

ORDERED that the defendants' motion is denied in part and granted in part; it is further

ORDERED that the Mexico City Policy Statement is not inconsistent with, and in excess of the Foreign Assistance Act of 1961, 22 U.S.C. § 2151 (1982), and the Continuing Appropriations Act of 1985, Pub.L. No. 98–473, 98 Stat.1888; it is further

ORDERED that the Agency for International Development's ("AID") implementing clauses as to domestic nongovernmental organizations (NGO's) and to foreign NGO subgrantees are an unconstitutional violation of plaintiff DKT Memorial Fund, Ltd.'s ("DKT") first amendment rights of freedom of speech and association and are hereby stricken on their face; it is further

ORDERED that AID is enjoined from requiring foreign NGO subgrantees to certify that they "[d]o not perform or actively promote abortion as a method of family planning in AID-recipient countries and [do] not provide financial support to any other foreign [NGO] that conducts such activities." AID is also enjoined from requiring domestic NGO's to agree that they "will not furnish assistance for family planning under this grant to any foreign [NGO] which performs or actively promotes abortion as a method of family planning in AID-recipient countries or which provides financial support to any other foreign [NGO] that conducts such activities." AID may, however, require foreign NGO's to certify that they will not use AID funds to perform or actively promote abortion; it is further

ORDERED that the foreign plaintiffs, Population Services Family Planning Programmes Ltd. ("PSE" for Population Services Europe) and Parivar Seva Sanstha ("PSS"), lack standing to bring first amendment claims; and it is further

ORDERED that this case is dismissed.